IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MASTER LOCK COMPANY, a Delaware corporation, AMERICAN LOCK COMPANY, a Delaware corporation, and ALC HOLDING COMPANY, a Delaware corporation, | ) ) ) ) | |
| | ) | Case No. 05 C 3933 |
| | ) | |
| | ) | Judge Virginia M. Kendall |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| VAN ZANDT HAWN and MICHAEL ISRAEL, individually and as Stockholder Representative under a certain Agreement and Plan of Merger dated as of March 28, 2003, by and among Master Lock Company, a Delaware corporation, Twinspin Acquisition Co., a Delaware corporation, ALC Holding Company, a Delaware corporation, and the Stockholder Representative, | ) ) ) ) ) ) ) ) ) | |

Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiffs Master Lock Company ("Master Lock"), American Lock Company ("American Lock"), and ALC Holding Company ("ALC," together with Master Lock and American Lock, "Plaintiffs") brought this action against Defendants Van Zandt Hawn ("Hawn") and Michael Israel ("Israel") for breach of certain provisions of an Agreement and Plan of Merger executed by Plaintiffs and Defendants on March 28, 2003 (the "Merger Agreement"). Plaintiffs' five-count Complaint alleges that the terms of the Merger Agreement oblige Defendants to reimburse Plaintiffs for certain losses and environmental cleanup costs that Plaintiffs incurred as a result of: (i) breaches of certain environmental warranties contained in the Merger Agreement; (ii) investigating and remediating hazardous substances on and under certain real property located in Crete, Illinois (the "Crete Site") which is the subject of the Merger Agreement; and (iii) obtaining a No Further Remediation Letter

("NFR") from the Illinois Environmental Protection Agency ("IEPA") with respect to the Crete Site. Defendants disagree.

Before the Court are the parties' Motions for Summary Judgment on all counts of the Complaint. Plaintiffs argue that the clear and unambiguous language of the Merger Agreement requires Defendants to indemnify them for losses resulting from Defendants' breaches of certain representations and warranties and for other losses and environmental cleanup costs as those terms are defined in the Merger Agreement. Defendants, while they also contend that the language of the Merger Agreement is clear and unambiguous, interpret its indemnification provisions substantially differently than do Plaintiffs. Defendants argue that Plaintiffs have no claim for indemnification because the costs and losses at issue do not arise from third-party claims and because Plaintiffs were not otherwise required to incur those costs and losses by a governmental agency or third party claim. In other words, Defendants argue that Plaintiffs are not entitled to indemnification for the costs and losses at issue because those costs and losses were voluntarily incurred. Defendants also argue that the expenses Plaintiffs have incurred as a result of Defendants' alleged breaches of representations and warranties are either unreasonably high or not recoverable at all.

For the reasons set forth herein, Plaintiffs' motion for summary judgment is granted in part and denied in part and Defendants' Motion for Summary Judgment is denied.

## STATEMENT OF FACTS

**The Parties.**

On March 28, 2003, Plaintiffs and Defendants executed the Merger Agreement, which merged TwinSpin Acquisition Company, a wholly owned subsidiary of Master Lock into American Lock with American Lock continuing as the surviving corporation. (Pltfs.' 56.1 ¶ 1; Defs.' Response

¶ 1.)[1]   For approximately fifty years, American Lock, a Delaware corporation, manufactured

padlocks, keys and lock parts on the Crete Site.  (Pltfs.' 56.1 ¶ 2; Defs.' Response ¶ 2.)  The Crete

[1] The facts are presented in the parties' statements pursuant to Local Rule 56.1 ("L.R. 56.1").  Defendants' Statement of Undisputed Material Facts is cited as "Defs.' 56.1 ¶ __"; Plaintiffs' Statement of Undisputed Material Facts is cited as "Pltfs.' 56.1 ¶ __"; The responses thereto are cited as "Defs.' Response ¶ __" and "Pltfs.' Response ¶ __"; Plaintiff's Statement of Additional Facts submitted in opposition to Defendants' motion for summary judgment is cited as "Pltfs.' 56.1(b)(3)(c) ¶ __"; and Defendants' Response thereto  is cited as "Def.'s 56.1(b)(3)(c) Response ¶ __".

The Court notes with considerable displeasure that the parties have failed to comply with L.R. 56.1.  That rule requires a party moving for summary judgment to file a statement of undisputed material facts consisting of "short numbered paragraphs."  Ignoring that obligation, Plaintiffs have filed a statement of undisputed material facts that contains 11 paragraphs lengthy enough that Plaintiffs chose to present them as primary paragraphs with separately-numbered sub-paragraphs.  By way of example, Plaintiffs' paragraph 32 spans nearly four pages and includes 16 sub-paragraphs.  At first glance, Plaintiffs' statement of material facts contains 77 paragraphs – three paragraphs shy of the 80 paragraph limit imposed by L.R. 56.1.  However, counting each of Plaintiffs' sub-paragraphs as free-standing paragraphs reveals that Plaintiffs' statement actually contains 127 paragraphs – 47 paragraphs over the limit imposed by L.R. 56.1.  Plaintiffs have also filed a "Reply to Defendants' Response to Plaintiffs' Statement of Additional Undisputed Material Facts" as well as a "Reply to Defendants' Responses to Plaintiffs' Local Rule 56.1 Statement of Material Facts in Support of Their Motion for Summary Judgment."  Neither of these documents is contemplated by L.R. 56.1.  The first of these documents was accompanied by a motion for leave, in which Plaintiffs requested permission to file the document *instanter*, but offered no explanation whatsoever as to why deviation from L.R. 56.1 was necessary – other than reporting that Plaintiffs had filed the document "as a matter of course."  Plaintiffs did not seek leave to file the second of these documents.

Making matters worse, Defendants' Response to Plaintiffs' Local Rule 56.1 Statement also fails to comply with L.R. 56.1.  The rule requires responses to a statement of material facts to contain, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon..."  Defendants frequently respond to Plaintiffs' statements with argument or otherwise fail to point to support in the record for their disagreement with Plaintiffs' facts.  For example, in response to Plaintiffs' paragraph 49, Defendants state, without a single citation to the record:

Plaintiffs dispute Paragraph 49.  Mr. Wagner agreed that testing is appropriate where there is a material threat of a release.  He did not agree that REC 2 posed such a threat.  Moreover, Mr. Wagner did not agree that the proposed actions were reasonable in the context of an indemnification claim.

(Defs.' Response ¶ 49.)

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence.  *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1)  The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."  *Ammons v. Aramark Uniform Srvcs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases)).  "A district court does not abuse its discretion  when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."  *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7 th Cir. 2005) (citing *Midwest Imports Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) for the proposition that "[a] local rule of a federal district court is written by and for district judges to deal with the special problems of their court, and we are disposed therefore to give a district judge's interpretation of his court's local rules . . . considerable weight.").  Accordingly, this Court would have been justified in disregarding substantial portions of the parties' L.R. 56.1 papers and would also have been justified in disregarding Plaintiffs' two replies, which are nowise contemplated by L.R. 56.1, in their entirety.  Nevertheless, in the interest of resolving the parties' dispute as efficiently as possible, the Court has endeavored to wade through the parties' non-compliant documents in resolving the parties' motions.

Site, through April 16, 2003, consisted of approximately 40 acres of land, including several ponds,

a 100,000 square foot manufacturing building, another smaller manufacturing building, and more

than ten other buildings and structures.  (Defs.' 56.1 ¶ 11; Pltfs.' Response ¶ 11.)

Hawn and Israel acquired American Lock and the Crete Site in 1998 and owned both until

2003, when they sold to Plaintiffs pursuant to the Merger Agreement.  (Pltfs.' 56.1 ¶ 3; Defs.'

Response ¶ 3.)  Hawn and Israel are parties to the Merger Agreement and are designated therein as

"Stockholder Representatives" for the sellers.  *Id.*  With respect to Defendants (sellers), Hawn had

ultimate responsibility for the Merger Agreement.  (Pltfs.' 56.1 ¶ 6; Defs.' Response ¶ 6.)

For Plaintiffs (buyers), Allan John Snape ("Snape") had primary responsibility for the Merger

Agreement.  (Pltfs.' 56.1 ¶ 5; Defs.' Response ¶ 5.)  Snape is Vice President of Business

Development for Fortune Brands, the parent company of Master Lock, American Lock and ALC.

*Id.*

**Environmental Indemnity Terms in the Merger Agreement.**

Section 10.01 of the Merger Agreement provides that Defendants:

> shall indemnify, defend, reimburse and hold harmless [Plaintiffs] from and
> against any and all *Losses* . . . resulting from or relating to . . .
>
> (a) any breach of any representation or warranty . . . contained in Article III
> of this Agreement . . .
> (g) . . . (i) any *Cleanup Costs* . . . incurred or suffered by the [Plaintiffs] as a
> result of *Hazardous Substances* existing on, in or under the Real Property to the
> extent such *Hazardous Substances* require investigation, remediation or any other
> action under Environmental Laws to meet cleanup criteria applicable to the Real
> Property; and (ii) *Cleanup Costs* incurred or suffered by the [Plaintiffs] as a result of
> actions reasonably necessary to obtain determinations from the applicable state
> governmental entity that no further remediation is required with respect to the Real
> Property.

(Pltfs.' Exh. 3, Merger Agreement at § 10.01.) (emphasis added). With respect to Section 10.01(a),

Defendants represented and warranted in Section 3.15(b) of the Merger Agreement that:

> (i) Each of ALC and the Company complies in all material respects with all Environmental Laws applicable to the operation of its business . . .
> (ii) Each of ALC and the Company possesses (or has timely filed applications pending for) all material licenses and permits required by all Environmental Laws applicable to the ownership of its assets and the conduct of its business; . . .
> (iv) No underground storage tanks are or to the knowledge of ALC have ever been located on the Real Property which contain or, to the knowledge of ALC, previously contained any Hazardous Substances . . .

With respect to Section 10.01(g), the Merger Agreement defines "Losses" as:

> any and all demands, claims, payments, obligations, actions or causes of action, assessments, losses, liabilities, damages, costs and expenses paid or incurred, including without limitation any legal or other expenses reasonably incurred in connection with investigating or defending any claims or actions and all amounts paid in settlement of claims or actions in accordance with Section 10.04 hereof. . .

*Id.* at § 10.10. The term "Cleanup Costs" is defined as:

> reasonable costs, liabilities, damages and expenses, (including, without limitation, legal and consultant expenses and response costs under CERCLA and other Environmental Laws), to investigate, monitor, remediate, clean up or otherwise address Hazardous Substances.

*Id.* at § 10.01. The term "Hazardous Substance" is defined to include:

> (i) any pollutant, contaminant, hazardous substance or waste, solid waste, regulated, defined, or designated as hazardous, extremely or imminently hazardous, dangerous, or toxic under any Environmental Law, including but not limited to the following federal statutes and their state counterparts, as well as these statutes' implementing regulations: the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9201 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and the Hazardous Materials Transportation Act ("HAZMAT"), 42 U.S.C. §1801 et seq.; (ii) petroleum or any fraction thereof; (iii) friable asbestos; and (iv) natural gas synthetic gas, and any mixture thereof.

*Id.* at § 3.15(a)(ii).

The Merger Agreement also provides that

> Fees and expenses of Leisch Associates, Inc. that were or will be charged to ALC or the Company that are not incurred in connection with the transactions contemplated pursuant to this Agreement . . . and have not been paid by ALC or the Company prior to the Closing shall first be charged against any funds remaining in the escrow established by the 1998 Escrow Agreement and, if those funds are insufficient or are otherwise unavailable to be used for such purpose, shall be deemed to constitute Environmental Claims subject to indemnification hereunder.

*Id.* at § 10.08(b)(ii).

The Agreement closed on April 16, 2003. (Defs.' 56.1 ¶ 25; Pltfs.' Response ¶ 25.) At that time, Defendants placed $2 million in escrow to cover any indemnification obligations they might have under the terms of the Merger Agreement. *Id.*

**Defendants' Environmental Investigation and Remediation Efforts at the Crete Site.**

As part of their due diligence in connection with the acquisition of the Crete Site, Defendants hired Dana Wagner ("Wagner") of Liesch Associates, Inc. ("Liesch") to perform a site visit and author a Phase I Environmental Site Assessment ("Phase I Assessment"). (Pltfs.' 56.1 ¶ 9; Defs.' Response ¶ 9.) Under standards promulgated by the American Society for Testing and Materials ("ASTM"), a Phase I Assessment includes a determination of whether a property has any "recognized environmental conditions" ("RECs"), which are defined as "the presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release . . . into structures on the property or into the ground, groundwater, or surface water." *Id.* Wagner's 1998 Phase I Assessment concluded that there were six RECs and sixteen environmental compliance or investigative activities of note at the Crete Site, including potential concerns with the north pond, the truck loading-dock

area, the hangar area, and potential concerns regarding residential underground storage tanks ("USTs"). (Pltfs.' 56.1 ¶ 10; Defs.' Response ¶ 10.)

Liesch oversaw a Phase II Environmental Site Assessment ("Phase II Assessment") in the areas of the six RECs at the Crete Site. (Pltfs.' 56.1 ¶ 12; Defs.' Response ¶ 12.) A Phase II Assessment involves intrusive sampling of soil and/or groundwater in an attempt to resolve RECs identified in a Phase I Assessment. *Id.* In addition to the areas of the six RECs, Liesch also oversaw sampling of the north pond, but did not obtain data for the area of the pond near the discharge pipe of the facility's effluent. *Id.*

After Defendants acquired the Crete Site in 1998, and based upon the sampling results from the Phase II Assessment, they asked Liesch to obtain on their behalf a focused NFR from the IEPA for the truck loading-dock and airplane hangar areas only. (Pltfs.' 56.1 ¶ 13; Defs.' Response ¶ 13.) NFRs are available under the IEPA's voluntary Site Remediation Program ("SRP"). (Defs.' 56.1 ¶ 15; Pltfs.' Response ¶ 15; Pltfs.' 56.1 ¶ 35(a).) Liesch worked for approximately five years to obtain a focused NFR for the truck loading-dock and airplane hangar areas at a cost to Defendants of approximately $200,000 – 250,000. (Pltfs.' 56.1 ¶ 15.) Liesch was not able to obtain a focused NFR as of the closing date for the agreement at issue in this case. *Id.*

**Plaintiffs' Environmental Investigation and Remediation Efforts at the Crete Site.**

In late 2002, Defendants decided to sell American Lock – and the Crete Site along with it. (Pltfs.' 56.1 ¶ 17; Defs.' Response ¶17.) Because the Plaintiffs entered the bidding process late, Defendants required them to complete their due diligence promptly. *Id.* As part of their due diligence, Plaintiffs asked Defendants for information related to environmental conditions at the Crete Site. (Pltfs.' 56.1 ¶ 18; Defs.' Response ¶18.) In addition to requesting information from

Defendants, Plaintiffs hired their own environmental consultant – Environmental Resources Management, Inc. ("ERM") – to conduct an updated Phase I Assessment. (Pltfs.' 56.1 ¶ 19; Defs.' Response ¶19.) ERM was aware of Liesch's environmental work at the Crete Site and was also aware of Liesch's efforts to obtain a focused NFR with respect to the truck loading-dock and airplane hangar areas.

ERM's Phase I Assessment identified nine RECs and various environmental compliance issues at the Crete Site. (Pltfs.' 56.1 ¶ 20; Defs.' Response ¶20.) ERM noted concerns about the impact hazardous materials may have had upon various parts of the Crete Site beyond the truck loading-dock and hangar areas. *Id.* More specifically, ERM noted visual evidence of spills of hazardous materials in various parts of the facility, including areas with floor cracks, a former oil separator system; current and former USTs; and the potential discharge of the facility's wastewater effluent to the north pond. *Id.*

Before the closing, and in order to resolve the RECs it had identified during its Phase I Assessment, ERM proposed (1) nine groundwater monitoring wells; (2) six borings for soil beneath the main building on the Crete Site; and (3) sampling of the north pond, including sampling near effluent discharge points. (Pltfs.' 56.1 ¶ 21; Defs.' Response ¶21.) Plaintiffs presented ERM's proposal to Defendants and asked for permission to sample the north pond; the truck loading-dock area; and the screw machine, finished product distribution/storage, and ink storage areas. *Id.* Defendants did not allow Plaintiffs to conduct the sampling they requested and limited Plaintiffs' sampling to the north pond only. (Pltfs.' 56.1 ¶ 22; Defs.' Response ¶22.) Plaintiffs determined that the contamination that ERM's sampling revealed in the north pond did not rise to a level that would lead Plaintiffs to terminate the transaction. *Id.*

After the transaction closed, Plaintiffs asked ERM to investigate, via a Phase II Assessment, sixteen areas of environmental concern at the Crete Site, including the RECs identified in ERM's Phase I Assessment and additional areas of concern discovered after the transaction closed. (Pltfs.' 56.1 ¶ 32; Defs.' Response ¶ 32.) ERM's Phase II Assessment confirmed environmental contamination in certain areas of the Crete Site. (Pltfs.' 56.1 ¶ 32; Defs.' Response ¶ 32.) Plaintiffs responded by enrolling the Crete Site in the Illinois Site Remediation Program ("SRP") with the goal of obtaining an NFR letter from IEPA for the entire Crete Site. *Id.*

Entering the SRP is a voluntary decision. (Pltfs.' 56.1 ¶ 35(a); Defs.' Response ¶ 35.) SRP applicants receive NFRs from the IEPA upon demonstrating to IEPA's satisfaction that the applicant has successfully completed the SRP requirements. (Pltfs.' 56.1 ¶ 35(b); Defs.' Response ¶ 35.) To obtain an NFR from the IEPA, Plaintiffs were required to comply with the SRP regulations, set forth in the Illinois Administrative Code, tit. 35, pts. 740, 742. (Pltfs.' 56.1 ¶ 36; Defs.' Response ¶ 36.) Plaintiffs were also required to meet the IEPA's requirements for the site, including sampling and remedial actions specified by the IEPA. *Id.*

In February 2004, ERM submitted a report to the IEPA detailing its Phase I and Phase II work and offering a remediation plan for the Crete Site for the IEPA's approval. (Pltfs.' 56.1 ¶ 46; Defs.' Response ¶ 46.) The IEPA reviewed and approved Plaintiffs' proposed remediation plans but required additional work to be done at the Crete Site in order to obtain an NFR. (Pltfs.' 56.1 ¶ 47(b); Defs.' Response ¶ 47; Pltfs.' Exh. 32.) ERM has performed work as required and approved by the IEPA. (Pltfs.' 56.1 ¶ 50; Defs.' Response ¶ 50.)

**Plaintiffs Applied For and Obtained Necessary Wastewater Permits.**

The wastewater discharged from American Lock's pretreatment system contains the toxic pollutants lead and zinc as well as a class of toxic pollutants known as phenols. (Pltfs.' 56.1 ¶ 60; Defs.' Response ¶ 60.) In 1996, American Lock constructed a wastewater pretreatment system designed to treat wastewater before it is pumped to Consumer Illinois Water Company's municipal wastewater treatment plant. (Pltfs.' 56.1 ¶ 61; Defs.' Response ¶ 61.) At the time the parties closed on the Merger Agreement, American Lock did not possess a valid wastewater construction and operating permit. *Id.* Plaintiffs applied for and obtained such a permit. (Pltfs.' 56.1 ¶ 62; Defs.' Response ¶ 62.) After the closing of the Merger Agreement, Plaintiffs collected and disposed of wastewater offsite until such time as it had obtained the joint construction and operating permit. *Id.* In connection with the application for a pretreatment permit and with the collection and offsite disposal of wastewater until such permit was issued, Plaintiffs incurred expenses of $73,754.45. *Id.*

**Plaintiffs Removed Underground Storage Tanks at the Crete Site.**

In November of 2003, Plaintiffs identified a UST at the Crete Site near the rim and mortise building. (Pltfs.' 56.1 ¶ 63; Defs.' Response ¶ 63.) In June 2004, Plaintiffs and ERM found two additional USTs on the Crete Site near the residences located to the east of the north pond. *Id.* Each of the USTs contained heating oil. *Id.*

Upon investigating the USTs, Plaintiffs found that each of them had leaked hazardous contents into the surrounding soil. (Pltfs.' 56.1 ¶ 64; Defs.' Response ¶ 64.) Plaintiffs removed the USTs and remediated the contaminated soil. *Id.* In so doing, Plaintiffs incurred expenses in the amount of $88,547.35. (Pltfs.' 56.1 ¶ 65; Defs.' Response ¶ 65.) Defendants concede that the costs

associated with removing the USTs and remediation of the contaminated soil constitute Losses under the Merger Agreement. (Pltfs.' 56.1 ¶ 66; Defs.' Response ¶ 66.)

**Plaintiffs Incurred Expenses in Connection with Producing a Storm Water Pollution Prevention Plan and a Spill Prevention Control and Countermeasures Plan and in Connection with Additional Environmental Compliance Efforts.**

American Lock, at the time the Merger Agreement closed, operated under a General NPDES Permit that required the creation of a Storm Water Pollution Prevention Plan ("SWPPP"). (Pltfs.' 56.1 ¶ 57; Defs.' Response ¶ 57.) Plaintiffs prepared and implemented an SWPPP at a cost of $4,050.00.[2] (Pltfs.' 56.1 ¶ 58; Defs.' Response ¶ 58.)

American Lock has the capacity to store petroleum in amounts greater than 1,320 gallons in the aggregate. (Pltfs.' 56.1 ¶ 59; Defs.' Response ¶ 59.) Plaintiffs developed a Spill Prevention Control and Countermeasures Plain ("SPCC") at a cost of $5,499.54. *Id.*

Plaintiffs conducted several training sessions for American Lock employees to educate them on the newly implemented SWPPP and SPCC plans and to inform them of proper waste handling and emergency procedures. (Pltfs.' 56.1 ¶ 67(a); Defs.' Response ¶ 67.) Plaintiffs developed and implemented hazardous waste management procedures. (Pltfs.' 56.1 ¶ 67(b); Defs.' Response ¶ 67.) Plaintiffs helped to establish proper storage requirements for hazardous and universal wastes located at the Crete Site. (Pltfs.' 56.1 ¶ 67(c); Defs.' Response ¶ 67.) Plaintiffs determined appropriate disposal standards for the varying wastes generated at the Crete Site. (Pltfs.' 56.1 ¶ 67(d); Defs.'

---

[2]Plaintiffs' 56.1 statement asserts that Plaintiffs incurred a cost of $6,732.00 in preparing and implementing the SWPPP. As support for that total, Plaintiffs submitted invoices from ERM for a project named "SWPPP - American Lock" and a separate invoice from Manestar Construction ("Manestar") for charges related to the installation of floor coating. Though Defendants have not properly disputed the Manestar invoice, Plaintiffs have not explained how the floor coating charges relate to the preparation or implementation of the SWPPP. Accordingly, the Court has subtracted the amount of the Manestar invoice from the total costs Plaintiff claims to have incurred in connection with preparation and implementation of the SWPPP.

Response ¶ 67.) Plaintiffs spent time, energy and resources labeling solvent cleaners and used oil drums at the Crete Site. (Pltfs.' 56.1 ¶ 67(e); Defs.' Response ¶ 67.) In connection with these activities, which Plaintiffs label "general compliance" activities, Plaintiffs incurred costs of $31,120.35. (Pltfs.' 56.1 ¶ 68; Defs.' Response ¶ 68.)

**Plaintiffs' Payments to Liesch.**

Following the closing of the Merger Agreement, Liesch submitted invoices to Plaintiffs for professional services rendered in connection with focused NFR work performed in the truck loading-dock and airplane hangar areas at the Crete Site. (Pltfs.' 56.1 ¶ 69; Defs.' Response ¶ 69.) Plaintiffs paid the invoices in a total amount of $6,892.00. (Pltfs.' 56.1 ¶ 70; Defs.' Response ¶ 70.)

**Plaintiffs Presented Defendants with a Notice of Claims for Indemnity.**

Pursuant to Section 10.08 of the Merger Agreement, Plaintiffs submitted several claims for indemnification to Duane B. Grahovec ("Grahovec"), the Stockholders' Representative under a previous agreement referred to in the Merger Agreement as the "1998 Escrow Agreement." (Pltfs.' 56.1 ¶ 73; Defs.' Response ¶ 73; Merger Agreement § 10.08(b).)[3] Grahovec denied each of Plaintiffs' requests for indemnification. (Pltfs.' 56.1 ¶ 73; Defs.' Response ¶ 73.)

---

[3] Though not adequately explained in the parties' L.R. 56.1 statements, the Merger Agreement requires Plaintiffs to first seek indemnification from Grahovec before seeking indemnification from Defendants:

> provided further, that the Buyer Indemnified Parties shall not be permitted to make any Environmental Claim against the Stockholders unless and until all amounts remaining in escrow under that certain Escrow Agreement dated as of August 31, 1998 by and among the Company, Duane B. Grahovec, as Stockholders' Representative thereunder, and LaSalle National Bank, as escrow agent thereunder (the '1998 Escrow Agreement'), to the extent available to the Company following the Closing to satisfy such Environmental Claims; provided, further, notwithstanding the forgoing, in no event shall a Buyer Indemnified Party be required to litigate, sue or arbitrate any such Environmental Claim under such 1998 Escrow Agreement and shall only be required to pursue indemnification thereunder in a commercially reasonable manner as determined in such Buyer Indemnified Party's reasonable discretion.

(Merger Agreement § 10.08(b)) (emphasis in original).

In April 2004, Plaintiffs requested indemnification from Defendants for the environmental claims that are the subject of this lawsuit. (Pltfs.' 56.1 ¶ 74; Defs.' Response ¶ 74.) Plaintiffs' claim letters included explanations of activities performed at the Crete Site, the relationship of those activities to provisions of the Merger Agreement, and invoices detailing the costs of those activities. (Pltfs.' 56.1 ¶ 75; Defs.' Response ¶ 75.) Defendants have not approved any payments to Plaintiffs for their environmental indemnity claims. (Pltfs.' 56.1 ¶ 76; Defs.' Response ¶ 76.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion

of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## ANALYSIS

The primary issue in this case is whether the environmental remediation expenses at the core of the parties' dispute are subject to indemnification under the Merger Agreement. The answer to that question turns on an interpretation of the language of the indemnification provisions in the Merger Agreement. In this case, the parties have agreed that the Merger Agreement will be governed by and construed in accordance with the laws of the State of Delaware. (Merger Agreement § 11.10.)

The proper construction of a contract is a question of law appropriately resolved on a motion for summary judgment. *Aetna Cas. & Sur. Co. V. Kenner*, 570 A.2d 1172, 1174 (Del. 1990). When construing a contract, the document must be considered as a whole. *Eugene A. Delle Donne & Son, L.P. v. Applied Card Sys., Inc.*, 821 A.2d 885, 887 (Del. 2003). Clear and unambiguous contractual language will be given its ordinary and usual meaning. *Rhone-Poulenc Basic Chem. Co. V. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). A contract is not rendered ambiguous by virtue of a disagreement between the parties as to its proper construction. *Id.* at 1196. Instead, a contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).

"Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Id.* (citing *Zullo v. Smith*, 427 A.2d 409, 412 (Conn. 1980)). Delaware courts look to dictionaries for assistance in determining the ordinary meaning of terms that are not

defined in a contract. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006). "The true test [of the meaning of a contractual provision] is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc*, 616 A.2d at 1196 (citing *Steigler v. Ins. Co. of N. Am.*, 384 A.2d 398, 401 (Del. 1978)).

I.  **Properly Construed, The Merger Agreement Entitles Plaintiffs To Indemnification For The Categories Of Losses At Issue.**

   A.  The Definition "Losses" Does Not Preclude a Claim for Indemnification in the <u>Absence of a Claim or Action by a Third-Party.</u>

Article X of the Merger Agreement sets forth the indemnification provisions at the heart of the parties' dispute. Section 10.01 provides that Defendants "shall indemnify" Plaintiffs "from and against any and all Losses (as defined in Section 10.10) resulting from or relating to" certain enumerated events. Defendants correctly note that under Section 10.01, Plaintiffs must be able to identify a "Loss" – as that term is defined in Section 10.10 – resulting from or related to one of the events described in Section 10.01 in order to articulate a valid claim for indemnification under the Merger Agreement. Section 10.10 of the Merger Agreement defines "Losses" as "any and all demands, claims, payments, obligations, actions or causes of action, assessments, losses, liabilities, damages, costs and expenses paid or incurred, including without limitation any legal or other expenses reasonably incurred in connection with investigating or defending any claims or actions and all amounts paid in settlement of claims or actions in accordance with Section 10.04 hereof."

Defendants offer the tenuous argument that the definition of "Losses" in Section 10.10 of the Merger Agreement precludes Plaintiffs from making any claim for indemnification in the absence of a claim or action against Plaintiffs by a third-party. Defendants' argument suggests that the

definition of "Losses" should be read so as to limit the availability of indemnification for any payment or obligation resulting from one of the enumerated events to situations in which the payment or obligation is "reasonably incurred *in connection with* investigating or defending any *claims or actions*." (Merger Agreement § 10.10) (emphasis added).

Defendants' strained interpretation of Section 10.10 essentially treats the phrase, "including without limitation any legal or other expenses," as a parenthetical phrase and can best be understood by sectioning the definition of "Losses" as follows:

"Loss" or "Losses" means . . .

demands, claims, payments, obligations, actions or causes of action, assessments, losses, liabilities, damages, costs and expenses paid or incurred,

including without limitation any legal or other expenses

reasonably incurred in connection with investigating or defending any claims or actions

and all amounts paid in settlement of claims or actions in accordance with Section 10.04 hereof.

Treating the phrase "including without limitation any legal or other expenses" as a parenthetical allows Defendants to argue that all "Losses" (whether they be demands, claims, payments, etc.) must be "reasonably incurred in connection with . . . claims or actions."[4] In isolation, the obvious flaw with this interpretation of the definition of "Losses" is that accepting it would require this Court to amend the contract to add a comma after the phrase "including without limitation any legal or other

---

[4]Defendants argue that all "demands, claims, payments," etc., must be *both* "paid or incurred" *and* "reasonably incurred in connection with investigating or defending any claims or actions." This cannot be correct, as it would render superfluous the word "incurred" in the phrase "paid or incurred."

expenses."[5] For this reason alone, Defendants' reading of Section 10.10 cannot be correct. *RAG Am. Coal Co. v. AEI Resources, Inc.*, No. 16728, 1999 Del. Ch. LEXIS 226, *18-19 (Del. Ch. Dec. 1, 1999) (citing *Emmons v. Hartford Underwriters Insur. Co.*, 697 A.2d 742, 746-47 (Del. 1997) for the proposition that "[a] court will not ignore a contract's language and choice of punctuation [or, in this case, the lack thereof] when doing so would essentially constitute 'adding a limitation not found in the plain language of the contract.'").

In addition to failing in isolation, Defendants' interpretation of the definition of "Losses" suffers from the additional malady that it cannot be reconciled with other provisions contained in Article X of the Merger Agreement. *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996) (contracts "should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document"). Defendants insist that the definition of "Losses" must be interpreted to limit the availability of a claim for indemnification to only those situations in which the claim for indemnification is for a payment or obligation that was "reasonably incurred *in connection with* investigating or defending any *claims or actions*" asserted against Plaintiffs by third-parties. (Merger Agreement § 10.10) (emphasis added). However, one of the enumerated events for which Section 10.01 provides a claim for indemnification is "(c) Third-Party Claims (as defined in Section 10.10)." Section 10.10 makes abundantly clear that "Third-Party Claims" is a subset of "Losses":

> "Third-Party Claims" means any and all Losses which arise out of or result from (i) any claims or actions asserted against an Indemnitee by a third party, (ii) any rights of a third party asserted against an Indemnitee, or (iii) any liabilities of, or amounts payable by an Indemnitee to a third party arising in respect of, claims, actions and rights referred to in the foregoing clauses (i) or (ii).

---

[5]Commas are to be used "[t]o mark the beginning *and ending* of a parenthetical word or phrase . . ." Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE 714 (2d ed. 1995) (emphasis added).

The definition of "Third-Party Claims" indicates that not all "Losses" arise out of "claims or actions." Moreover, if – as Defendants argue – "[i]n the absence of a claim or action by a third-party, by definition, there is no 'Loss,'" then the specific provision for indemnification from and against those Losses resulting from or relating to Third-Party Claims set forth in Section 10.02(c) of the Merger Agreement would be entirely superfluous. (*See* Defs.' Mem. in Support of Mtn. for Summary Judgment at p. 9.) In other words, if a claim or action by a third party were presupposed by the definition of "Losses," it would be wholly unnecessary for the Merger Agreement to specifically provide for indemnification "from and against any and all Losses . . . resulting from or relating to . . . (c) any Third-Party Claims."[6] *See Certainteed Corp. v. Celotex Corp.*, No. 471, 2005 Del. Ch. LEXIS 11, *9-10 (Del. Ch. Jan. 24, 2005) ("In the context of a merger or asset acquisition, the term 'indemnification' refers generally to the responsibility retained by the seller to make the buyer whole for liabilities related to the assets sold or for breaches of representations and warranties. 'Indemnification,' as used in Article 8, does not refer to the common law right known as 'indemnity.' That is, Article 8 does not provide a general right of reimbursement for debts owed to third parties by Celotex as a secondarily-liable party. This is evidenced by language in § 8.4(c) of the Agreement

---

[6]This point also forecloses any argument that the misuse of the relative pronoun "which" in the definition of "Third-Party Claims" gives rise to any ambiguity. *See* H.W. Fowler, MODERN ENGLISH USAGE 625-26 (2d ed. 1965) ("The two kinds of relative clause, to one of which *that* and to the other of which *which* is appropriate, are the defining and the non-defining; and if writers would agree to regard *that* as the defining relative pronoun, and *which* as the non-defining, there would be much gain in both lucidity and in ease. Some there are who follow this principle now; but it would be idle to pretend that it is the practice either of most or of the best writers."). "Restrictive clauses are essential to the grammatical and logical completeness of a sentence. Nonrestrictive clauses, by contrast, are so loosely connected with the essential meaning of the sentence that they might be omitted without changing the essential meaning." Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE 766 (2d ed. 1995). In the definition of "Third-Party Claims," the clause introduced by "which" could not be omitted without equating "Third-Party Claims" with "Losses." As explained above, this would render entirely redundant the Merger Agreement's specific provision for indemnification "from and against any and all Losses . . . resulting from or relating to . . . (c) any Third-Party Claims." Accordingly, the Court treats the use of the relative pronoun "which" in the definition of "Third-Party Claims" as nothing more than a common and unintentional usage blunder.

that specifically distinguishes 'Third Party Claims' from claims generally covered under the indemnification remedy.").

Nor can Defendants' interpretation of the definition of "Losses" be reconciled with Section 10.05 of the Merger Agreement. That Section, titled "Notice of Other Claims" provides that "[i]n the event any Indemnitee should have a claim against any Indemnitor hereunder that does not involve a Third-Party Claim being asserted against or sought to be collected form the Indemnitee, the Indemnitee shall notify the Indemnitor . . . [who] shall remit . . . payment for the amount of such claim . . ." Section 10.05 indisputably contemplates claims for indemnification arising from Losses that do not result from or relate to claims or actions against Plaintiffs by third-parties. Accordingly, because it cannot be reconciled with the remainder of Article X of the Merger Agreement, Defendants' interpretation of the definition of "Losses" must be rejected.

For their part, Plaintiffs offer an interpretation of the definition of "Losses" that not only makes sense in isolation – as a matter of grammar and punctuation – but also squares with the remainder of the indemnification provisions in Article X of the Merger Agreement. Plaintiffs note that the comma after the phrase "paid or incurred" sets off the phrase "including without limitation any legal or other expenses reasonably incurred in connection with investigating or defending any claims or actions . . ." from the remainder of the definition of "Losses." Accordingly, the language "reasonably incurred in connection with . . . any claims or actions" applies only to the subject of the set-off phrase: "legal or other expenses." Reading the definition of "Losses" in this way defines "Losses" as "demands, claims, payments obligations, actions or causes of action, assessments, losses, liabilities, damages costs and expenses" – each of which must be "paid or incurred" in order to form the basis of a claim for indemnification. Also included in the definition of "Losses" are

"legal or other expenses" that are related to investigating or defending any claims or actions filed against Plaintiffs by a third-party – a subset of "Losses" which must be *reasonably* incurred to be indemnifiable.

This construction of the definition of "Losses" gives effect to the clear and unambiguous language of the Merger Agreement and allows the definition of "Losses" to be reconciled with the other indemnification provisions in the Merger Agreement. Accordingly, this Court finds that the Merger Agreement's definition of "Losses" does not limit Plaintiffs' claims for indemnification to those that arise from a claim or action filed against Plaintiffs by a third-party.

        B.        Cleanup Costs Related to Hazardous Substances or Participation in the SRP are Indemnifiable under the Merger Agreement in the Absence of a Third-Party Claim or Threat of Enforcement Action by IEPA.

Defendants also argue that Section 10.01(g) of the Merger Agreement, which provides for indemnification from and against Losses resulting from or related to Cleanup Costs, does not encompass Plaintiffs' "voluntary participation in the Site Remediation Program." Defendants read Section 10.01(g) to indicate that the only Cleanup Costs that are indemnifiable are those that are "required," which term Defendants interpret to contemplate an "affirmative obligation" imposed upon Plaintiffs "in conjunction with 'claims made'" by third parties. (*See* Defs.' Mem. in Support of Mtn. for Summary Judgment at p. 11.) As explained below, these arguments must also be rejected.

        1.        *A third-party claim is not a prerequisite to a claim for indemnification for Cleanup Costs under the Merger Agreement.*

First, the language of Section 10.01(g) does not require Cleanup Costs to be incurred in connection with claims made by third parties in order to be indemnifiable under the Merger

Agreement. Indeed, Section 10.01(g) makes no mention whatsoever of third-party claims. To construct their argument, Defendants train their sights on the words "claims made" in the sentence "[n]otwithstanding anything in this Agreement to the contrary, in all instances, Buyer shall control and direct any actions deriving from *claims made* pursuant to Section 10.01(g)." (Merger Agreement at Section 10.01) (emphasis added). Defendants surgically extract the words "claims made" from that sentence and transplant them into Section 10.01(g) in order to manufacture a third-party claim prerequisite attendant to that Section. Setting to one side the fact that Section 10.01(g) does not mention "claims made," the plain language of the sentence in which those words actually do appear demonstrates that "claims made" cannot refer to third-party claims. As Plaintiffs correctly note, the only claims that can be made "pursuant to Section 10.01(g)" of the Merger Agreement are Plaintiffs' claims for indemnification for "Cleanup Costs." Defendants have not identified any provision in the Merger Agreement that would grant a third-party permission to make a claim "pursuant to" Section 10.01(g).

> 2. *A claim for indemnification is available for "Losses" incurred in connection with Plaintiffs' "voluntary" participation in the SRP.*

Defendants further argue that Cleanup Costs must be "required" in order to be indemnifiable under either subsection of Section 10.01(g). Defendants contend that because Plaintiffs voluntarily undertook to engage in environmental remediation activity at the Crete Site – at least in the sense that no third-party or governmental agency forced Plaintiffs to act – they are not entitled to indemnification for any Cleanup Costs. In support of their argument Defendants cite to *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 173-74 (2004) for the proposition that "an insured who seeks indemnification on the basis that it acted under a legal obligation imposed by a strict

liability statute must have acted in response to an assertion by a potential plaintiff (in this case, the IEPA) that it must act or face the consequences." Accordingly, Defendants insist that because no agency or third-party has threatened Plaintiffs with legal liability, Plaintiffs are not entitled to indemnification under the Merger Agreement.

In response, Plaintiffs correctly note that the Merger Agreement is to be governed by and construed in accordance with the laws of the State of Delaware and not Illinois. (Merger Agreement § 11.10.) Nevertheless, in the absence of any helpful case law from the Delaware courts, this Court could treat *Central Illinois Light* as persuasive authority if the Illinois Supreme Court had been called upon to interpret substantially similar contract terms under substantially similar facts. However, the contract at issue in that case was different from the contract at issue in this case and for that reason *Central Illinois Light* is readily distinguishable.

In *Central Illinois Light*, an insured sought indemnification for its expenditures related to investigation and remediation of certain real property under two different indemnification provisions. The first provision required indemnification for "any and all sums which the Insured *shall by law become liable to pay and shall pay* or by final judgment be adjudged to pay . . . *as damages* . . . to property." 213 Ill.2d at 148 (emphases in original). The second required indemnification for "all sums which the Assured *shall be obligated to pay by reason of the liability*: (a) *imposed* upon the Assured *by law*, or (b) *assumed under contract or agreement* with the Named Assured *for damages* on account of . . . Bodily Injury [or] Property Damage." *Id.* (emphasis in original). The court held that:

> The term "damages" connotes the existence of another party who is asserting a claim.
> . . . *under the language of the CLMI policies*, the claim need not take the form of a
> lawsuit or administrative proceeding. However, at the very least, an insured who

seeks indemnification on the basis that it acted under a legal obligation imposed by a strict liability statute must have acted in response to an assertion by a potential plaintiff (in this case, the IEPA) that it must act or face the consequences. A purely unilateral effort by an insured to clean up contaminated property *may fulfill a statutorily mandated legal obligation*, but the expenditures made *do not constitute damages*.

*Id.* at 172 (emphasis added).

The holding in *Central Illinois Light* turned on the fact that the policies at issue in that case made indemnification available only for "damages." Even though an insured might, by the operation of a strict liability statute, be legally required to incur remediation expenses, those expenses would not be indemnifiable under the policy language at issue in *Central Illinois Light* unless they were "damages." The court held that the insured was entitled to indemnification for its cleanup expenses because the IEPA had threatened to enforce Illinois' strict liability environmental statutes against the insured. *Id.* at 174. The court noted that "by making a claim, the allegedly injured party (in this case the people of the State of Illinois through the IEPA) asserts that the other party is legally obligated to provide a remedy, *in the form of damages*, for the alleged injury." *Id.* (emphasis added). Accordingly, because the IEPA had threatened enforcement action against the insured, the remediation expenses at issue qualified as "damages" and were indemnifiable under the policies at issue. *Id.* at 176.

In this case, the Merger Agreement provides for indemnification for "Losses" resulting from or related to "Cleanup Costs." While the definition of "Losses" includes "damages," it also includes "payments," "assessments," and "costs and expenses." Similarly, the definition of "Cleanup Costs" is not limited solely to damages; it also includes "costs" and "expenses" to "investigate, monitor, remediate, clean up or otherwise address Hazardous Substances." Unlike the policy language at

issue in *Central Illinois Light*, none of the terms *payments*, *assessments*, or *costs and expenses* necessarily "connotes the existence of another party who is asserting a claim." *Id.* at 172.

Nor does the Merger Agreement employ any other device that would limit the availability of indemnification for "Cleanup Costs" to situations in which enforcement actions have been threatened or initiated by the IEPA. Section 10.01(g)(i) provides for indemnification when "Hazardous Substances [on the Crete Site] require investigation, remediation or any other action under Environmental laws to meet cleanup criteria applicable to the [Crete Site]." Section 10.01(g)(ii) provides for indemnification for "Cleanup Costs incurred or suffered . . . as a result of actions reasonably necessary to obtain determinations from the applicable state governmental entity that no further remediation is required with respect to [the Crete Site]." In other words, to the extent the environmental laws of the State of Illinois require Plaintiffs to remediate – and they do – indemnification is available under the Merger Agreement for the resulting Cleanup Costs.[7] In addition, indemnification is also available for Cleanup Costs incurred in connection with "obtain[ing] determinations from [the IPEA] that no further remediation is required" – an NFR. At the time the Merger Agreement was drafted, these sophisticated parties were both aware that such determinations were available via voluntary participation in the SRP. Had the parties desired to limit the availability of indemnification for Cleanup Costs to only those costs Plaintiffs might be compelled to incur by the IEPA and to bar indemnification for any costs incurred in connection with voluntary participation in the SRP, they certainly could have done so. The Court will not now rewrite the Merger Agreement the way Defendants wish it had been written in the first instance. *See*

---

[7]"The [Illinois Environmental Protection Act] is clear that CILCO is strictly liable for the contamination at its MGP sites. Thus, the Act *most assuredly requires* CILCO to remediate." *Central Illinois Light*, 213 Ill.2d at 168 (emphasis added) (citing the Illinois Environmental Protection Act, 415 ILCS 5/1 *et seq.*).

*DeLucca v. KKAT Mgmt.*, No. 1384-N, 2006 Del. Ch. LEXIS 19, *7 (Del. Ch. Jan. 23, 2006) ("it is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not.").

Accordingly, the Court finds that a threat of liability made by IEPA is not a prerequisite to a claim for indemnification for "Cleanup Costs" under the Merger Agreement. The Court also finds that the Merger Agreement does not preclude Plaintiffs' claim for indemnification for Cleanup Costs that were reasonably necessary to obtain determinations from the IEPA that no further remediation is required with respect to the Crete Site even if those Cleanup Costs were incurred via voluntary participation in the SRP.

## II. Plaintiffs Are Entitled to Summary Judgment for Losses Resulting From or Relating to the Presence of USTs on the Crete Site.

Plaintiffs argue, pursuant to Section 10.01(a) of the Merger Agreement, that they are entitled to indemnification for Losses resulting from or relating to Defendants' breach of the warranty or representation articulated at Section 3.15(b)(iv) of the Merger Agreement: that "[n]o [USTs] are or to the knowledge of ALC have ever been located on the Real Property which contain or, to the knowledge of ALC previously contained any Hazardous Substances."[8] It is not disputed that Plaintiffs located three USTs on the Crete Site that contained heating oil. Nor is it disputed that each UST had leaked its contents into the surrounding soil. Defendants do not dispute that Plaintiffs incurred expenses in the amount of $88,547.35 in connection with investigating, removing and remediating the USTs and their surrounding areas.

---

[8] Once again, the Court notes in Section 3.15(b)(iv) the misuse of the relative pronoun "which" and treats it as a common and unintentional usage blunder. The parties' arguments make clear that both parties read this provision to warrant that no USTs that contain or previously contained hazardous substances are or ever have been located on the Crete Site (as opposed to a warranty that no USTs are or ever have been on the Crete Site and, by the by, USTs either presently contain or at some time in the past contained hazardous substances).

Defendants do not argue that the USTs do not constitute a breach of the warranty or representation articulated at Section 3.15(b)(iv) of the Merger Agreement. Indeed, during his deposition, Hawn testified that "we're perfectly willing to accept our responsibility for making payments for recognized environmental conditions, or whatever the jargon is, and a leaky underground storage tank is that." (Pltfs.' Exh. 4, Hawn Dep. at 47:19-22). Defendants' only argument against Plaintiffs' motion for summary judgment for indemnification with respect to the USTs is that "[u]nder state and federal law, Master Lock could have simply drained any remaining residues and filled the empty tanks with inert material such as sand or concrete." (Defs.' Response to Pltfs.' Mtn. for Summary Judgment at 10.) In support of this argument, Defendants cite only to 40 C.F.R. § 280.71(b), which states, in its entirety:

> To permanently close a tank, owners and operators must empty and clean it by removing all liquids and accumulated sludges. All tanks taken out of service permanently must also be either removed from the ground or filled with an inert solid material.

Aside from the sentence quoted above, Defendants do not offer any authority, argument, or evidence that filling in the USTs would have been an option available to Plaintiffs even if the USTs had not leaked their contents into the surrounding soil, which they did. This is not sufficient to overcome Plaintiffs' motion for summary judgment with respect to indemnification for Losses resulting from or relating to Defendants' breach of warranty concerning the USTs. Accordingly, the Court finds that Plaintiffs' are entitled to summary judgment in the amount of $88,547.35 on this claim for indemnification.

### III. Plaintiffs Are Entitled to Summary Judgment for Losses Resulting From or Relating to Obtaining Necessary Wastewater Pretreatment Permits for the Crete Site.

Plaintiffs argue, pursuant to Section 10.01(a) of the Merger Agreement, that they are entitled to indemnification for Losses resulting from or relating to Defendants' breach of the warranty or representation articulated at Section 3.15(b)(ii) of the Merger Agreement: that "[e]ach of ALC and the Company possesses (or has timely filed applications pending for) all material licenses and permits required by all Environmental Laws applicable to the ownership of its assets and the conduct of its business." Specifically, Plaintiffs argue that they are entitled to indemnification for Losses resulting from or relating to Defendants' failure to have necessary wastewater pretreatment permits for the Crete Site.

Plaintiffs argue that they were required to obtain a permit for the wastewater pretreatment system by operation of 35 Ill. Adm. Code § 309.204(a), which provides that "[n]o person shall cause or allow the use or operation of any treatment works, pretreatment works or wastewater source without an operating permit issued by the Agency." It is undisputed that at the time the parties closed on the Merger Agreement, American Lock did not possess a valid wastewater construction and operating permit. In order to bring the pretreatment system into compliance with § 309.204(a), Plaintiffs applied for and obtained such a permit. In addition, after the closing of the Merger Agreement, Plaintiffs collected and disposed of wastewater offsite until such time as it had obtained the joint construction and operating permit. In connection with the application for a pretreatment permit and with the collection and offsite disposal of wastewater until such permit was issued, Plaintiffs incurred expenses of $73,754.45.

Defendants do not argue that obtaining a permit was not necessary or that their failure to have one at the time the Merger Agreement closed was not a breach of Section 3.15(b)(ii) of the Merger Agreement. Instead, Defendants argue, without citing to any authority or evidence whatsoever, that the "great majority of these costs were *likely* unnecessary." (Defs.' Response to Pltfs.' Mtn. for Summary Judgment at 9) (emphasis added). Defendants base this argument on their unsupported claim that "industry practice would have been to contact the relevant municipal utility and confirm that continued [treatment and] discharge was acceptable during the pendency of the permit application." *Id.* at 9-10. Defendants' unsupported assertions as to industry practice notwithstanding, § 309.204(a) requires a permit for operation of a pretreatment system and does not contain an exception related to obtaining consent from the relevant municipal utility. Nor have Defendants pointed to any other authority standing for the proposition that Plaintiffs might have continued to operate the pretreatment system without the required permit.

With respect to the expenses resulting from or related to Defendants' failure to have a necessary permit for the wastewater pretreatment system at the Crete Site, Defendants have failed to offer any opposition to Plaintiffs' motion for summary judgment other than the bald assertion that the expenses Plaintiffs have incurred are not reasonable because they were "likely" unnecessary. This is not sufficient to overcome Plaintiffs' motion with respect to these expenses. Accordingly, the Court finds that Plaintiffs' are entitled to summary judgment in the amount of $73, 754.45 on this claim for indemnification.

**IV.    Issues of Material Fact Prevent the Entry of Summary Judgment In Plaintiffs' Favor For Other Losses.**

A.    The Leisch Work

Defendants concede that Plaintiffs have paid invoices submitted by Leisch in the amount of $6,892.00.  The Merger Agreement provides that such sums constitute Environmental Claims subject to indemnification.  (Merger Agreement § 10.08(b)(ii)).  However, before making a claim for indemnification under the Merger Agreement for the money paid to Leisch, Plaintiffs were required first to pursue indemnification from Grahovec under the 1998 Escrow Agreement in a commercially reasonable manner.  *Id.*  While Defendants concede that Plaintiffs have made "a claim" under the 1998 Escrow Agreement and that claim was denied, Plaintiffs have not demonstrated that any claim made under that Agreement included a claim for the Leisch work and, if it did include such a claim, that Plaintiffs pursued indemnification from Grahovec for the Leisch Work in a commercially reasonable manner.  Accordingly, Plaintiffs motion for summary judgment is denied with respect to the Leisch Work.

B.    Cleanup Costs Incurred in Connection with Defendants' Efforts to Obtain an NFR.

As explained above, the Merger Agreement provides for indemnification from and against any Losses resulting from or related to Cleanup Costs incurred by Plaintiffs as a result of actions reasonably necessary to obtain an NFR.[9]  It is undisputed that, in pursuit of an NFR for the Crete Site, Plaintiffs (or their consultants) performed work as required and approved by the IEPA.

---

[9]Defendants distinguish between a "focused NFR" (which applies only to a portion of a site) and a "comprehensive NFR" (which applies to the entire site) and argue that indemnification may be available for the former but not the latter.  This argument is a non-starter.  The Merger Agreement provides for indemnification for Cleanup Costs reasonably necessary to obtain an NFR "with respect to the Real Property."  (Merger Agreement § 10.01(g)(ii).  The "Real Property" at issue in the Merger Agreement is the Crete Site.  Accordingly, indemnification is available for Cleanup Costs associated with efforts to obtain an NFR with respect to the entire Crete Site.

Plaintiffs assert that they have incurred $262,711.59 to date in investigation and remediation costs in pursuit of an NFR from the IEPA. (Pltfs.' 56.1 ¶ 52.) In support of that assertion, Plaintiffs cite to a number of ERM invoices. However, those invoices contain precious little information.[10] It is impossible to determine, from the invoices alone, precisely what work was done and whether any or all of that work was related to Defendants' efforts to obtain an NFR from the IEPA. In other words, Plaintiffs have not adequately demonstrated that the $262,711.59 they claim to have incurred in pursuit of an NFR were, in fact, "Cleanup Costs incurred . . . as a result of actions reasonably necessary to obtain [an NFR]."[11] Such a demonstration is essential to Plaintiffs' claim for indemnification with respect to these costs. Accordingly, Plaintiffs' motion for summary judgment is denied with respect to Cleanup Costs incurred in pursuit of an NFR.

C.    Losses Resulting From or Related To Breaches of Representations or Warranties in Article III of the Merger Agreement Other Than Those Related to USTs.

Plaintiffs further claim that they are entitled to indemnification for the following Losses resulting from or related to additional breaches of Section 3.15(b)(i) of the Merger Agreement: (i) Defendants' costs incurred in connection with the SWPPP and the SPCC; and (ii) costs incurred in connection with certain "general compliance" activities.

_____

[10]The invoices from ERM for UST excavation and remediation work also provide very little information, however those invoices all refer to a project name, "American Lock UST," that is, at least, related to the claim for indemnification. In their 56.1 Response, Defendants did not dispute or object to those invoices. In contrast, the invoices submitted by Plaintiffs to substantiate their claim for indemnification for costs incurred in pursuit of an NFR all refer to a generic project called "American Lock." Further, in their 56.1 Response, Defendants noted the vagueness of these invoices, stating "[t]he invoices do not establish that the charges relate to activity in furtherance of obtaining an NFR letter." (Defs.' Response ¶ 52.)

[11]That Plaintiffs also seek indemnification of these same costs, in the alternative, under Section 10.01(g)(i) of the Merger Agreement (as Cleanup Costs associated with investigating and remediating Hazardous Substances) is of no moment; the invoices still contain too little information to allow the Court to determine whether Plaintiffs are entitled to indemnification.

*1. Costs associated with the SWPPP and the SPCC.*

With respect to the SWPPP and the SPCC, it is uncontested that Plaintiffs incurred expenses in preparing both. Nor do defendants appear to argue that the SWPPP and the SPCC were not required by the applicable Environmental Laws. (Merger Agreement § 3.15(b)(i).) Plaintiffs appear to assume that this is the end of the inquiry, but it is not. In order to demonstrate that they are entitled to indemnification for the expenses incurred in preparing the SWPPP and the SPCC, Plaintiffs must demonstrate that Defendants breached the warranty expressed in Section 3.15(b)(i) of the Merger Agreement by *failing to comply* in some material respect with an applicable Environmental law. *Id.*

The exhibits Plaintiffs submit in support of their motion for summary judgment indicate that Defendants did have an SWPPP and an SPCC in place at the time the Merger Agreement closed. ERM determined that neither plan was in compliance with the applicable law. (Pltfs.' Exh. 39, Ltr. from ERM at 00250-00251). Accordingly, Plaintiffs incurred expenses preparing what they assert are an SWPPP and an SPCC that are in compliance with the applicable law.

Aside from the bare legal conclusions expressed in ERM's letter, Plaintiffs have offered no evidence whatsoever that the SWPPP and SPCC that were in place at the time the Merger Agreement closed did not comply with the applicable Environmental laws. Without such evidence, it is not possible for the Court to arrive at a determination as to whether the SWPPP and SPCC that were in place at the time the Merger Agreement constitute breaches of Section 3.15(b)(i) of the Merger Agreement for their failure to comply with the applicable environmental law. Accordingly, the Court cannot determine whether the costs Plaintiffs incurred in connection with the preparation and

implementation of the SWPPP and the SPCC are indemnifiable and Plaintiffs motion for summary judgment with respect to these costs must therefore be denied.

2. *Costs associated with "general compliance" activities.*

With respect to the "general compliance" activities, there is no dispute that Plaintiffs incurred expenses (i) conducting training sessions for American Lock employees to educate them on the newly implemented SWPPP and SPCC plans and to inform them of proper waste handling and emergency procedures; (ii) developing and implementing hazardous waste management procedures; (iii) helping to establish proper storage requirements for hazardous and universal wastes located at the Crete Site; (iv) determining appropriate disposal standards for the varying wastes generated at the Crete Site; and (v) labeling solvent cleaners and used oil drums at the Crete Site. Once again, Defendants do not appear to argue that such general compliance activities are not required by applicable environmental laws. However, Plaintiffs have not directed the Court's attention to admissible evidence that establishes that such activities were necessary in this case. Accordingly, Plaintiffs motion for summary judgment is denied with respect to costs incurred in connection with general compliance activities.

So ordered.

_____

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: April 16, 2007